JOHN GASSERT v. ALDOR G. ANDERSON AND OTHERS.[1]

December 31, 1937.

No. 31,491.

[1]Reported in 276 N. W. 808.

*Henry Paull* and *Westley W. Silvian,* for appellant.

*C. J. Dodge* and *Abbott, MacPherran, Dancer, Gilbert & Doan,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff prevailed in his suit for specific performance, and defendant Anderson, record owner of the involved property, appeals from the resulting judgment.

Defendant Friedmann, then owner of the property, in August, 1934, entered into a lease with one Nichols, the lease period extending two years from September 1 of that year. Incorporated in the lease was an option granting to the lessee the right of purchasing the property for $2,500 at any time during the lease period. Later, on July 18, 1935, Friedmann sold the premises, subject to the lease and the option, to Anderson. The deed was recorded September 12. Nichols gave notice of his election and readiness to exercise the option, but Anderson refused to convey; hence this suit. After its commencement Nichols transferred his interest in the lease and option to plaintiff, who thereupon filed an amended complaint, with himself as plaintiff. Upon issues duly framed, the suit went to trial, with the result hereinbefore indicated.

The findings of the court cover every fact issue pleaded and litigated. We shall further discuss these under the various subdivisions into which defendant has grouped his assignments of error.

■ We agree with defendant that the existence of the option depends upon the existence of the lease; that is to say, if the lease had expired or ceased to exist as such for any cause prior to the time the optionee exercised his right to make the option contract an effective engagement of sale and purchase, then obviously no right could be based or predicated upon it. But we cannot agree, as is contended by defendant, that any breach of the lease on the lessee's part, even if sufficient to justify termination thereof, would *ipso facto* cancel it. Since "it is optional with the lessor whether to avail himself of the breach of a covenant giving him a right to forfeit the lease, it follows that, if he desires to forfeit, he must manifest his intent by some clear and unequivocal act * * *." 35 C. J. p. 1075 [§ 248] (3).

■ Rather, we think, the question is whether the lease *was validly cancelled* by the lessor for any such violation prior to the time of lessee's notice of election to exercise the option so as thereby

to bring into being a contract of purchase valid and binding upon the owner as vendor and the optionee as purchaser.

The general rule is that where an option has been exercised it becomes a contract for the sale of the property on the part of the lessor and a binding agreement upon the lessee to pay the option price. A more adequate statement of the rule is found in 35 C. J. pp. 1041, 1042 [§ 185] (2) (and cases cited under notes) as follows:

"Where the option to purchase is duly exercised by an election to purchase, the relation of landlord and tenant ceases and that of vendor and purchaser arises, and the lessor cannot, by a breach of a covenant to convey, compel the continuance of the relation of landlord and tenant for the purpose of creating a breach of covenant to pay rent so as to enable him to declare the option forfeited. The possession of the lessee becomes that of owner, and he will be entitled to such other rights as may be said to attach to his character as vendee, insofar as the rights of the parties are not peculiarly controlled by express stipulations in the lease. The lessor is not entitled to rent after the option to purchaser is exercised, unless there is an express stipulation therefor."

Therefore it would seem logically to follow that in event there is a consummation of a contract for sale brought about by virtue of the exercise of the option, the lessor cannot abrogate such right by thereafter undertaking to forfeit the lease because of claimed past violations thereof.

So the question is, we repeat, whether there was in fact a *cancellation* of the lease by the lessor (or by defendant as his successor in title) or by mutual abandonment thereof by the parties prior to the exercise of the option.

Defendant claims various violations of the lease by the lessee and bases his refusal to convey thereon. These are listed in his brief as (1) failure to keep premises in neat, clean, and respectable condition; (2) subletting to another a small garage to the rear of the main building and the latter's use thereof in such fashion as to make it a fire risk considered "extrahazardous" by insurance writ-

ers; (3) failure to pay rent in advance; and (4) failure to pay rent to defendant after he became owner of the property.

The court found all these claims against defendant. These findings are vigorously assailed as not sustained by the evidence. A careful examination of the record leaves no doubt that the court was right. But even were we to grant all defendant claims in this regard it does not help him. Unless and until he manifested his intent to forfeit the lease "by some clear and unequivocal act" before the tenant put the option into operation, the contractual obligation created by the lease remained in full force. 35 C. J. p. 1075 [§ 248] (3).

Defendant does not question that the general premise hereinbefore mentioned is sound. In his reply brief he makes this statement:

"We have no controversy with the respondent on this point as to the principle of law involved. We agree with the statement of respondent, 'The question is not whether the lessee violated the lease, but whether the lease was cancelled by the lessor for any such violation prior to the time when the lessee gave notice of his election to exercise the option,' * * * We do, however, dispute the contention of the respondent that the option as a *matter of fact* had been exercised prior to the cancellation of the lease."

Our attention is directed to the fact that on July 31, 1935, defendant wrote Carlson, who occupied the garage at the rear of the lot, as follows: "I have purchased from Mr. Alvin Friedman, his property at Moose Lake, Minn., am hereby notifying you to vacate the premises now occupied by you forthwith." And on September 19 he wrote to Nichols as follows: "Having purchased the above described property, I am hereby notifying you to vacate the present occupied premises forthwith." Obviously all these letters amounted to was that defendant claimed to have purchased the property, therefore *get out*. Nowhere is there any intimation that the tenants, or either of them, were to vacate the property because of any violations of the lease. Just as clearly defendant could not arbitrarily do away with a contract obligation voluntarily made by his grantor and subject to which he had acquired the property.

As we have seen, Nichols exercised his option on February 14, 1936, when he wrote Friedmann fully on the subject and thereby effectively put into operation the option of purchase. Not until March 11 did defendant awaken to the necessity of making some claim in respect to alleged defaults as a basis for his refusal to be bound by the terms of his contract with Friedmann.

It is important to bear in mind that throughout this entire time Nichols continued to deal in good faith with Friedmann and sent him the monthly rental payments in the form of cashier's checks, and he in turn forwarded them to Anderson. (Friedmann resided at Oakland, California, hence communication was by mail.) These payments represented rentals up to and including March, 1936, "and said Friedmann accepted all" of them "and never notified said Nichols" to pay rent to Anderson (so the court found upon adequate proof). Anderson kept these until the time of trial of this suit. As far as Nichols was concerned, no information ever came to him from the man with whom he dealt that there was a change of ownership requiring a different disposition of the rent payments from that embodied in the lease. By his letter of April 1, 1936, defendant for the first time informed Friedmann that he would not accept the checks as payment for rent and that he was holding them subject to the latter's instructions. Long theretofore, September 30, 1935, Nichols in remitting his monthly payment informed Friedmann that he intended to exercise his option.

Significant is the finding that on March 18, 1936, within a week after receiving defendant's letter of March 11 (where defendant for the first time claimed violations of the terms of the lease as a basis for its cancellation) Nichols through his duly authorized attorney notified defendant that he "had exercised his option to purchase said premises contained in said lease, and that said Nichols was ready to purchase said property and to pay the purchase price specified in said option."

Viewing the entire record, as we are required to do, we think there is abundant proof to sustain the trial court's view that Nichols acted in good faith throughout and lived up to his contract engagement; that the defendant, on the other hand, "at all times since his

purchase of said property refused to recognize any rights of said Nichols." He simply sat tight during all these months and held the monthly rental remittances paid by the tenant to Friedmann, who had promptly forwarded them to him.

■ It is claimed that Nichols' exercise of his rights under the option was fatally defective because no tender of the purchase money was made. Defendant cites and heavily relies upon Steele v. Bond, 32 Minn. 14, 18 N. W. 830; Moore v. Norman, 43 Minn. 428, 45 N. W. 857, 9 L. R. A. 55, 19 A. S. R. 247; Lau v. McKechnie, 202 Mich. 284, 168 N. W. 438, 439, and other cases of similar import.

That this issue presents a point of genuine difficulty cannot be denied. The court so recognized it and, as was its duty, made a most thoroughgoing study thereof both as to facts and applicable law. This is amply proved by the memorandum attached to the findings.

Of course here, as in all cases where contract rights are involved, one must look to the language of the instrument to ascertain the intent of the parties with reference thereto. The option reads as follows:

"The lessor hereby agrees with the lessee to sell and transfer to said lessee the above described property, by warranty deed for the total sum of $2,500, free and clear of all encumbrances, including taxes, should the lessee desire to purchase said property any time during the period of this lease. It is further understood and agreed that all rent payments will be made up to the time that this option is exercised."

In Steele v. Bond, 32 Minn. 14, 15, 18 N. W. 830, "the lessor conferred upon the lessees the right to purchase the lots at any time during the term, for the sum of $11,117, *to be paid in cash on demand of a deed* before the expiration of the term." (Italics supplied.) Naturally and properly, the court could do nothing else than construe the language chosen and used by the parties as requiring payment or tender "on demand of a deed." The language compelled that result. In the instant case, however, the engagement is that *"lessor * * * agrees * * *. to sell and trans-*

*fer * * * the above described property by warranty deed for the total sum of $2,500, * * * should the lessee desire to purchase said property any time during the period of this lease."* (Italics supplied.) Here the suit for specific performance was begun in May, 1936, long prior to the expiration of the lease period. Defendant by his prior conduct and by the form of his pleading clearly indicated that he was not going to go through with his bargain. In this respect the present case differs from Lau v. McKechnie, 202 Mich. 284, 286, 168 N. W. 438, because there the chancellor was of opinion: "I find equity would demand a tender of the money, for plaintiff, and demand of a deed, before bringing this action, *or at least an assurance that the money was deposited or arranged for, before defendant would have to proceed."* (Italics supplied.) More in point with the facts here appearing is Shiller v. Lange, 217 Mich. 121, 185 N. W. 699. There the court held that the filing of a bill for specific performance, with an agreement to purchase within the time limit prescribed by the option, which called for the delivery of an agreement to purchase, was equivalent to an acceptance of the option, hence enforceable in a suit for specific performance.

The court in Breen v. Mayne, 141 Iowa, 399, 403, 404, 118 N. W. 441, 443, said:

"The only fixed rule regarding the manner of the exercise of an option under a contract granting it, is to discover from the language of the instrument, construed in the light of competent parol testimony, the intent of the parties with reference thereto. It may be that under the terms of a given option the only proper and binding method of election or acceptance is by the payment or a tender of the purchase price. On the other hand, there are many cases where the option may be exercised in parol or by any other method indicating an election to take the land—the payment of the purchase price and the making of the deed being subsequent matters in performance of a binding contract. In the one case, there is an election to sell, upon payment of the purchase price, which is a condition precedent to the foundation of the contract; and in the other there

is an election to take the land upon the terms proposed, payment of the purchase price being a condition subsequent, or rather the performance of an executory contract theretofore entered into.

"It is important in such cases to distinguish that which pertains to the performance of a contract from that which pertains to its making. To make any sort of a contract, there must be a meeting of minds upon a given subject. An offer without acceptance is not a contract, and as a rule the acceptance to be binding must be in accord with the terms of the offer, and not in some other manner."

And in Behr v. Hurwitz, 90 N. J. Eq. 110, 114, 105 A. 486, 487-488, the court in construing an option to purchase held:

"When the complainant declared his option by his notice in writing served on the defendants, a mutual contract was created binding upon the one to buy and the other to sell, thereby vesting the equitable title in the complainant; and thereafter it was beyond the power of the defendants by wrongfully refusing for a period of almost two months (thereby being guilty of a breach of their covenant to convey) to compel the continuance of the relation of landlord and tenant, even after the bill was filed, for the purpose of creating a breach of the covenant to pay rent, thus enabling them to declare the option right forfeited."

And further (90 N. J. Eq. 118, 105 A. 489):

"The words 'to purchase for a certain sum' plainly indicate that the parties intended that the title should be passed in the ordinary manner, namely, that the deed and the purchase money should be delivered and the encumbrances discharged simultaneously."

Helpful also is Williams v. Gilbert, 120 Minn. 299, 303, 139 N. W. 502, 504, where the court said:

"Clearly the covenant by plaintiff to pay the purchase price, and the covenant of defendant to convey, are mutual and dependent. The payment was to be made when the sale was consummated by a proper conveyance, and the conveyance was to be made when the money was paid or legally tendered, on the day provided by the contract."

■ We are also of the view that the record clearly establishes that a tender would have been refused in any event. Defendant's attitude throughout the entire time after his acquisition of the property and at the trial proves this. In addition to what we have heretofore recited, the following quotation from the record is illuminating:

The Court: "That isn't the question. This option agreement in the lease, the question is whether you are anxious to avoid letting him exercise it.

A. "I will say I would not want him to.

Q. "You want to use that building for your own purposes and did when you bought it?

A. "Yes, sir."

In such a situation the following is a correct statement of applicable law:

"Not infrequently the necessity of making a tender is waived, and after a party to a contract, whose specific performance is sought, resists the performance, and insists that he is not bound by the contract, no tender of the purchase money need be made before bringing suit." 25 R. C. L. p. 321, § 136, and cases under note 13.

See also Brown v. Eaton, 21 Minn. 409; Matteson v. U. S. & C. Land Co. 103 Minn. 407, 115 N. W. 195.

The annotator in 79 A. L. R. 1240, quotes from Irvin v. Gregory, 13 Gray (Mass.) 215, 218, as follows:

"When a strict tender of money is required, it must be an unconditional offer of the full amount due, leaving it only at the will of the other to accept it. But when, in their nature, the stipulations are, the one to pay money and the other to execute a conveyance, and no time fixed, and no provision that either is to be done first, the covenants are mutual and dependent." And then proceeds to say (p. 1241): "In harmony with the view heretofore stated, the following cases hold or recognize that a tender by the vendee at the time fixed by the contract for its performance is not generally essential to his right to maintain an action for the specific per-

formance of the contract where the vendor is unable to convey a marketable title or refuses to do so." (Many pages of cases cited and analyzed follow, Minnesota cases being amongst them.)

■ Lastly and as a final shot, defendant seeks to avoid his obligation by claiming that there is no testimony in the case showing Nichols' ability to pay the purchase price when he gave notice of his election to exercise his option.

This is purely an afterthought. Nowhere in the record is any point made of it. Nor was the trial court's attention directed thereto. The issues presented and litigated are those hereinbefore referred to. However, even assuming that defendant's position is now such as to merit discussion, we think his belated effort in this direction cannot be sustained.

The contract is short, the language used simple and easily understood. No layman reading it could help understand its import and purpose. As we have already stated, no tender was necessary. It would therefore seem that Murray v. Nickerson, 90 Minn. 197, 203, 95 N. W. 898, 900, adequately covers the point now raised. There tenders were duly made but were not kept good. The vendors refused to convey, and a suit for specific performance followed. The vendees assigned their interest to a third party. Upon this showing the court was of the view that:

"The tenders of the amount due on the land by virtue of the contract, and the refusal of the tenders, put the vendor in default, and it was not necessary for the plaintiffs to bring the money into court. *All they were required to do after the tenders were refused, and their rights in the land fixed thereby, was to be ready and willing to pay when advised that the tenders would be accepted.* It is enough that they were ready and willing to perform, and tendered performance in their complaint." (Citing cases.) (Italics supplied.)

We think upon the showing here made, i. e., that plaintiff is ready, able, and willing to purchase and to close the transaction, nothing remains to be done except for defendant to execute the deed in conformity with the contract and judgment.

This is an equitable action. The court has carefully safeguarded the rights of the parties in its findings and judgment. Defendant's efforts to avoid compliance are founded upon pure technicalities, most of them trivial. We think it is the duty of the court to sustain contract engagements when fairly made and openly arrived at. Courts should not, nor do they, lend aid or comfort to those who seek to defeat obligations so made. Mere translucent mists should not be permitted to stand in the way of accomplishing justice. The learned trial court refused to permit its search for truth to be obscured thereby. We do not choose to close our eyes to what all men must readily see.

The judgment is affirmed.

